May it please the Court, my name is Katherine Windsor, and I represent Godwin Onyeabor. The issues that I plan to address are first, on behalf of all of the appellants, the Instructional Error Judicial Bias issue, and then if I have time, the Confrontation Clause issues surrounding the recorded phone call of my client and Mr. Obude, who is now deceased. So turning first to that Instructional Error Bias issue, the core of this issue is that the District Court, through its admonitions, disparaging remarks, and rulings on evidentiary matters, interfered with the trial so extensively as to render it unfair. Or as this Court has put it another way, the trial court's conduct created an atmosphere in which an objectively fair trial could not be conducted. These errors, which we are asking the Court to consider cumulatively, fall into four big categories, and they are first, that the Court misinstructed the jury on the burden of proof and reasonable doubt in a myriad of ways, which I can get into. Second, that the Court misinformed the jury that it could not consider basic impeachment of the government's witness in the form of bias and benefits, which happened with two defendants. Third, that the Court allowed the government to invade the province of the jury by allowing the government agent to opine about who he believes when he interviews and whether the defense's arguments would have changed his opinion of the investigation or how he would have conducted the investigation. And then finally, the Court denigrated Defense Counsel to such an extent that the defendants did not receive a fair trial. And we've really Can I ask you a question about those? And I tend to agree with you that there's a lot of things here that are not appropriate. Is it worse than the United States versus Scott? How do you distinguish Scott? Well, in Scott, the... There was a hundred in that case, a hundred admonitions to Defense Counsel, and it looks to me like a pretty bad case of judicial overreaching, but somehow this Court affirmed the conviction. Tell me why this is worse. This is worse because the burden of proof and reasonable doubt was implicated, and that's structural error. In addition to the impeachment and telling the jury that it was inappropriate to consider any kind of bias that the witness might have. So those, I mean, really the reasonable doubt just on its own is structural error. And Scott was focusing more on the bias issue, which we have here as well. But what our argument is really that the way that the district court was interacting and was ruling on these objections informed the jury as to how they could consider evidence and what the burden of proof was. So for example, when the judge was interrupting counsel's opening statement repeatedly and saying, counsel, opening statement is not valid. And then when he takes the next step and repeatedly says, you're not allowed to respond to the government's evidence. This is what you're going to show. And so at that point, the jury is interrupting defense counsel. But the issue with that is that the jury is being told that the defense, that there's a suggestion that the defense has some obligation to show what evidence that it's going to prove, that it has an obligation to prove something. And that's just one example. There's also when the defense counsel was questioning the government agent about gaps in its investigation, the district court stopped that line of questioning and said, the government is not on trial here. And that was done in a certain way, which created that sort of hostile environment. But what's most troubling is that the jury was told, we can't consider those, we're not to consider the gaps in the government's case. When, when you say the jury was told that they were told that implicitly as opposed to expressly, right? Exactly. When they, when the, when the district court says the government's not on trial here, it's not appropriate for you to ask about investigation that they could have done, but didn't do. The jury has sent a message that we're not supposed to look at that. That's not appropriate. When the judge cuts off cross-examination of a cooperating witness and says, counsel, stop beating up the witness. It's, it's first of all telling the jury that the defense counsel is behaving improperly in beating up the witness, but it's also telling, telling the jury it's not appropriate to consider that this witness might have some kind of bias. In this case, this witness had stolen $40,000 from her employer and was not being prosecuted for that. And that line of questioning was cut off. And so the jury was given throughout the trial in many ways, this misinformation about how to consider the evidence and what evidence it could consider. If I can, can I jump to my second issue or do you have, does the court have questions about that? What's your second issue? The second issue is the, um, the introduction of the, the confrontation clause issue relating to the introduction of the recorded phone call. And, um, that was the recording, um, and then the transcript, uh, that was introduced. Is it, is it a confrontation clause issue? I mean, the, the phone call itself was introducible, was it not? That sort of phone calls introduced all the time. I think, I think so. What makes it? So, so what your contention is was a confrontation clause issue because the agent said what he was talking about there was, was this. Exactly. But that, that's not a confrontation clause issue, isn't it? Isn't that just that the agent offered an opinion that he shouldn't have offered? Well, that's, I mean, the expert issue wasn't raised in the district court. I mean, there was an objection that he was making. He was, um, he was expressing an opinion. He wasn't noticed as an expert. And that may be a good objection, but that's not a constitutional problem. That's, that's a, that's an evidentiary problem, isn't it? It is a constitutional issue because Mr. Abude was the one, the deceased witness was the one who, um, who said what happened here was that Mr. Anyabur agreed with. You've briefed it well. We know what happens, but there's no, there's no evidence here that he was saying this because somebody else told him what it was. It was his, he'd set up this whole call and it was his, it was his conclusion that that's, that's what this reference was to. And then the evidence he was. I'd like to know what you think happened here, because I'm not exactly sure. My understanding is that there is a confrontation clause problem because of Mr. Abude was deceased and couldn't testify as to his comments, which were not clearly in English. Is that it? I mean, I want to know what you, you're saying it is. That's, yes, that's correct. That this, when you look at, when you listen to this call and you look at this transcript, you would never take away from it that, um, that Mr. Anyabur, uh, agreed to sell a prescription for a power wheelchair. I mean, there's no, that, that, um, that, that just doesn't occur in any, um, any cognizable form in that conversation. You don't object to the introduction of the call in the transcript, right? I do. We do. We objected. And in the, the, this was preserved very well in the trial court. The transcript without this hearsay doesn't make any sense. Um, and so if, you know, let's say there had been a transcript where Mr. Abude had called Mr. Anyabur and said, hello, Mr. Anyabur, I would like to buy a prescription for a power wheelchair or, or something, you know, maybe it wouldn't have been that clear, but something that was understandable. There's nothing in the transcript. The only way that you get that reading is from Mr. Abude saying, that's what happened, but Mr. Abude was dead. And that was my question. And I'm sorry, I asked it wrong. Is there anything in this record that said that Mr. Abude said to the agent, this is what I meant, or is this just the agent saying, this is what I interpret? That's it. If he was channeling Mr. Abude, that would be hearsay. If he's just saying, this is my conclusion, it's, it's a, it's an opinion that probably shouldn't be entered, but it's not hearsay. So that's my question. Well, there's evidence in the record that they went over the, they, they spoke after the call, they went over the transcript, um, many times. In fact, he said he went through it with him. Um, so I think we can certainly infer that, that, that was the, what happened, that Mr. Abude. Didn't Agent Watkins testify that the transcript, he had had the transcript prepared and then he gave it to Abude and Abude confirmed that it was accurate. Yes. So we don't even know if the transcript, we don't have Abude testifying that the transcript is accurate. We have Watkins saying that Abude, who's dead, told him the transcript was accurate. Yes. And the transcript alone doesn't even talk about a wheelchair. No, it does not. There's no, I mean, I looked through that transcript. I can't figure out where that would have occurred. I tried to read it myself. They spoke in Nigerian Pidgin, right? Yes. Although what the record says is that they spoke in a language that, um, or in another language that was difficult to understand. There certainly wasn't any translation that happened. I believe I've gone over my time. I don't want to steal from my co-counsel unless the court has further questions. Let's see. Let me see if I have further questions for you. Um, not at this time. So, well, let's hear from, is this, uh, Ms. Morishita's counsel next? Okay. May it please the court. I'm Stephen Fry, appearing on behalf of Ms. Morishita. I was also her trial counsel. Uh, we have joined the issues that were raised by Ms., Mr. Onyibar's lawyer with regard to the structural defects in the trial. The court can only reach my briefs if, uh, the court determines that the trial was not structurally deficient, but I won't doubt it. There were three primary, uh, pieces of evidence for want of a better term against my client. There was this alleged apparent interview with her by the FBI and the Health and Human Services. There was the checks that, uh, there were the checks that were paid to her by Fendi. And then there was a testimony of Dr. Glover. And I want to focus on the testimony of Dr. Glover. And in particular, one of the issues that I think needs to be elaborated upon in preparing for the argument today was whether the admission of Dr. Glover's testimony at all, which we maintain is improper, and then the, what we maintain is the improper restriction of my cross-examination of Dr. Glover. Uh, whatever errors occurred there were harmless. And with regard to the Confrontation Clause issue, it's our position that it was an abuse of discretion to restrict, to the extent that the trial court did, my cross-examination of Dr. Glover. First of all, I was attempting, as I think the record is clear, to get into the specific terms of Dr. Glover's plea agreement and the benefits he expected to receive from that agreement. And the court has long held that that is a proper subject of cross-examination. Had you gotten in, had you really gotten into the gist of that when the court cut you off? I'd gotten in, I'd started to get into it. I got into the maximum penalties and then I wanted to get into some of the specifics. So would you address, you yourself raised the question of whether or not it was harmless error at the point that he cut you off. Tell us why it wasn't. Well, it was not harmless. First of all, he, without an objection from the government, cut off the cross-examination saying it was irrelevant. Well, it's plainly not irrelevant, as the court previously held in Schoenenberg, that when you get into what the witness expects to receive as a benefit from the government, that's not irrelevant. And in fact, Schoenenberg's conviction was reversed because the court said that was a confrontational clause violation. And in that case, the judge prohibited the cross-examination because it was irrelevant. And it clearly was not irrelevant. But when considering the harmless error under Schoenenberg, under Larson, the court's required to consider four things. The importance of the witness's testimony, whether there's evidence corroborating what the witness said, the extent of the permitted cross-examination, and the strength of the fact was critical because it supplied a missing piece of evidence. The government had no evidence as to how Ms. Morishita obtained any prescriptions she allegedly sold to Fendi. There was no doctor that came in to testify, such as Dr. Grimes or Dr. Sapaya. This said that my client purchased prescriptions from them. And in fact, they both denied that they even knew my client. Dr. Glover, therefore, provided critical evidence that in some five to seven years earlier, he provided prescriptions for wheelchairs to Ms. Morishita at her request. He didn't say that he got any kickbacks. In fact, he testified he didn't. He did it because he wanted to keep the business. And the evidence was admitted for the ostensible purpose to show that my client's intent. But Dr. Glover never testified that my client ever, at least on his observation, ever knew that what she was asking him was wrong. He never said that, for example, that, hey, Ms. Morishita, you know, I'm a doctor. You know, you've been in this business. You know that's not right. You know that's illegal. And he never said any of that. He said she asked him for the prescriptions and he gave it to her. So why does the testimony hurt you, then? I'm sorry? Why does the testimony hurt you? He didn't testify that she did anything wrong back then. No, conceitedly, it helped in some way. Okay, so why is it a problem? But it is a problem because the government later was able to fill in by implication the missing piece in the actual case of TRIAD. And that is where Ms. Morishita was getting her prescriptions that she allegedly sold. Okay? And there was no evidence to corroborate what Dr. Glover testified. He didn't produce any, the government didn't produce any prescriptions that he had written and allegedly sold to her. Didn't produce any evidence that Medicare paid any of these particular prescriptions. Are you making an insufficiency of the evidence argument? I mean, that's why I'm having some, I agree with you. Glover doesn't tie her to this conspiracy, but so what? I mean, so he, the evidence comes in for whatever limited value it has. Why is it so prejudicial? Well, because, again, it supplied a missing piece of evidence that the government was, had no proof of in its actual case in chief. Now... Which element was that? I'm sorry? Which element do you contend was that? Well, well... Her intent? Yeah, well, it was ostensibly admitted to show her intent, but we maintain that it didn't actually show that based on the testimony that he said. But it actually, that it was admitted, or it supplied the missing information as to where she was getting the prescriptions. Because they didn't have any of that evidence. It supplied the M.O. I'm sorry? It sort of supplied the M.O., you know, the modus operandi. The modus? The modus operandi. Yes. Well, that's, I suppose, one of the, well, the government's 404B notice said that one of the things that they were going to prove by that was motive or intent, plan, the typical 404B... And that's why, as you say, it doesn't show that, and I guess then it's a, you're making an insufficiency of the evidence argument, aren't you? Well... I don't see one in your brief, that's what I'm asking. No, no, I, well, I didn't assert an insufficiency of the evidence argument because of my client's statement, frankly. To the FBI. To the FBI. The court, but given the inclusion of Dr. Glover's testimony, in addition to my client's is a violation of the confrontation clause by admitting that testimony from Dr. Glover, which supplied the information that was missing, both from her statement, and there are problems with the statement, as I think came out in cross-examination, that one of the key elements of that statement, and the government makes a big issue about this in their closing argument, is that my client brought up the statute of limitations herself when discussing the issue with the Health and Human Services, but that's, that wasn't in the agent's original notes that she took contemporaneously with my client's statement. That doesn't show up until whatever HHS equivalent of the FBI 302 is, it was an HHS memo of interview, that doesn't show up until she drafts that a few days later. So, when you consider all the relevant factors in the harmless error analysis, we maintain, as was the case in Schoenberg, that the limitation of the cross-examination of Dr. Glover was not harmless error, and that it was a violation of the conference clause, and abuse of the trial court's discretion. All right, thank you, counsel. Mr. Sherman? Good morning. I represent Dr. Wijegunaratne. To answer your question, Your Honor, as to how this case differentiates from Scott, actually I wasn't going to go into this, but in the Scott case, the court ruled that the judge was stopping defense counsel from engaging in irrelevant, repetitive, or otherwise improper questioning or editorializing. In this case, Your Honor, I don't think I did any of that. From the moment I walked into the courtroom until the completion of the case, the judge continually demeaned me in front of the client, starting from my opening statement through my cross-examination of the various witnesses, and indicated very clearly to the jury that I was acting improperly, and obviously that had a negative impact upon my credibility in front of the jury. So that was the problem, and the judge, at every turn, every opportunity he had to make a decision to harm my client, he engaged in that kind of behavior, both in front of the jury and in his rulings. Now, for instance, as far as the ruling goes, in this particular case, the doctor prepared 60, excuse me, 30 prescriptions of power wheelchairs. Prior to trial, I had made various motions and said, okay, here's the prescriptions. Tell me, government, what's wrong with these prescriptions, and the government consistently refused to indicate anything, there was anything wrong with the prescriptions, up to the moment of the trial. They cherry-picked six of them. Finally, they said, well, there's nothing facially wrong with those prescriptions. We're not saying that your client didn't see these patients. We're not saying that the diagnosis in the prescriptions wasn't accurate. We're not saying that the wheelchairs were not delivered. We're not saying that people accepted the wheelchairs and they signed for them. What we're saying is after the fact, you know, some of these patients didn't use the wheelchairs, and therefore, somehow, that that was a fraud, even though there's nothing about the prescriptions themselves are fraudulent. I then designated an expert and said, Dr. Ishaya, okay, I would like to call a medical expert who will testify and will corroborate Dr. Wittekunaratne's diagnosis that, in fact, these patients needed the wheelchairs, and that, in fact, he saw the patients, that when he said certain things were wrong with the patients, that was accurate based upon their medical history, that the people signed for the wheelchairs, and I wanted another expert to show that was consistent with the Medicare rules. The government then went and said, oh, no, you can't call the expert to corroborate your client, and the judge ruled in favor of the government and prevented me from calling two experts, even though they never presented any kind of a medical expert at all. In addition— Am I wrong, and I've been wrong a lot, in thinking that that's—is that a separate issue raised in your brief, the exclusion of the expert testimony? Oh, yes, that's a major part of our brief, Dr. Ishaya. And the expert testimony, but it's not a—that doesn't have to do with the—it is a separate issue, but you didn't raise that as part of the judicial bias part of the case, did you? Yes, I did, in the sense of—well, in the sense of the rules— And that's just not which part you were talking about at the time. Yeah, you know, that overall picture. As to those, why did the judge abuse his discretion in excluding those two witnesses? Well, Dr. Ishaya, who was a medical expert, was prepared to testify that, in fact, what Dr. Wijegunaratne wrote down in his prescriptions was accurate as to the medical conditions of the patient, that he had looked at the medical records of the patient as it existed, and he agreed that Dr.—let's call him Dr. Jay's—position as to why these people needed the wheelchairs was consistent with the observations that Dr. Jay made when he saw the patient, and it was consistent with the Medicare rules. That's why—and it corroborated the doctor. Isn't that really legally irrelevant? I think that's one of the weakest arguments you have, because if someone was truly engaged in Medicare fraud, they would do all those things that you just said Dr. Jay did. Well, not necessarily, Your Honor. Normally speaking, most of these cases, they don't see the patients, for one thing. The wheelchairs may not be delivered. It may be phony prescriptions, not by real doctors. I've done a lot of Medicare fraud cases, Your Honor, and I haven't seen any where, in fact—and, in fact, Dr. Jay was the only person in this particular case that was a doctor that actually did see the patients, the wheelchairs were delivered, and the people acknowledged that they received the patient. But your experts were simply going to say that these prescriptions, if you will, are facially valid. Well, not only— Right? They weren't going to say we saw—we went and examined these particular wheelchair recipients and it's accurate. Well, no. They were prepared to say that they looked at the patient's medical records and it was consistent with their medical condition. Okay. Thank you. That's what I was just—I wasn't clear, and Judge Ward will ask the same question. But look at it from the other side of the coin. What did the government put forth that, in fact, these people didn't need the wheelchairs or they weren't medically necessary? They didn't call any medical experts. They conceded that, in fact, the prescriptions complied with a Medicare regulation. They didn't say that the doctor was making up the prescriptions or making up the diagnosis. They presented basically two witnesses, Ms. Perez and Ms. Villa. Ms. Perez testified, and we've got it in the record, that she had her knee—this is before Dr. J examined her. Her knee had been removed after falling out of the shower. She had a shortened foot, a missing knee, and pins holding her ankle together. Now that was her medical condition. Her foot shattered, too, right? Yes. And she had a neuropathy. That was another thing that the judge refused to let me to do. When she was on the witness stand, I asked her about her medical records that showed she had neuropathy, which I understand means there's blood not to the foot, and so that you need a wheelchair, and the judge refused to let me ask those questions, even though I had the medical records right there and even though we had an investigator who had talked to her. So one of the two patients had obviously very severe medical problems. The other live patient that testified on government examination testified that she had fallen down 50 times in the past, and both of these patients admitted that they knew they were being prescribed wheelchairs and accepted the wheelchairs and used them partially but didn't use them all the time. So, you know, let's assume a doctor prescribes these wheelchairs based upon what he observed. Other medical doctors agree with it, and then after the fact, the patient may not use the wheelchairs all the time, and yet there's nothing in the records to indicate that the doctor is in any way making up the diagnosis. In addition, Your Honor, I had other medical records to show for the other prescriptions that the doctor wrote. But I wanted to put those into evidence to show that he was consistent, that these other people that the government interviewed, in fact, needed these wheelchairs. And I had three live witnesses that were available to testify that, in fact, they had seen the doctor, the same Fendi clients, and that they, in fact, used the wheelchairs, and the government objected to it. And even in their brief, they admit that the judge didn't make it very clear about whether these were Fendi patients or not, and the judge refused to let me bring these patients to show that the doctor had a good faith intent based upon what he did with other patients. The judge refused to give a good faith instruction to show that the Dr. J's state of mind was such a judge that he believed that, in fact, these patients needed the wheelchairs. In the government's rebuttal argument, the government argued that, why didn't the defense present the medical records of these various patients in support of his claim, thereby shifting the proof to me, even though they knew that I had tried to get in these medical records in my case in chief, and they objected to my getting this evidence in, and then argued, why didn't he bring them in? And the government basically conceded in their brief that that was basically improper on the part of the judge, that he should have given an instruction, that it wasn't the burden of the defendants to produce any evidence, but somehow their position is, well, you know, this case was so overwhelming, it doesn't really matter. Well, a lot of the government's argument in its briefs are that they do agree that there was error, but they argue that it was harmless. Okay, well, you know, how do we make that determination that it was harmless? This was an extremely weak case. They didn't have any witness, but let's just take the other example of the supposed kickback, which I think was a very important part of this case. The government was saying that he was being paid by Fendi for these prescriptions, and the way they tried to prove that is, they saw, they found a little piece of paper at the Fendi business when there was a search warrant that had the letter J on it, and based upon that piece of paper and the fact that they withdrew a certain amount of money over a period of time, around $20,000 out of the bank, and that during a different period of time, not corresponding with any of the withdrawals, Dr. J put cash in his bank of around $9,000, somehow that was a kick, that was a payment. I understand you think it's a weak case, but you're not arguing that there was not enough evidence to convict, are you? Absolutely. What was the evidence in this case? So you have an insufficiency of the evidence argument that if the evidence is taken in a light most favorable to the government, you still believe that there's not enough to go to the jury on your client? What evidence really was there in the case? Well, the way this works is I get to ask you questions. I am making that up. Especially, Your Honor, there was no instruction about medical necessity. No, I understand the arguments about legal error and structural error. I'm just trying to isolate your argument that even if all the evidence is taken in the light most favorable to the client and to the government, and the government committed and the judge committed no other errors, you still think your client is entitled to judgment as a matter of law. Yes? Well, the answer to that is somewhat ‑‑ I have to be a little bit ambiguous because he did prevent me from cross‑examining. No, but that's not the ‑‑ I think your answer is yes, but I want to make sure. Yeah, the answer ‑‑ The judge may don't ‑‑ let's assume the judge conducted a perfect trial. Everything happened perfectly. You just don't think at the end of that there's enough evidence to convict your client? Exactly, Your Honor. What evidence ‑‑ Okay. I told you before. Okay. Let me just finish this with a statement. The only evidence in this case is that after the fact, some of these patients didn't use the wheelchair. That's the bottom line. Let me ask you a question. So if we reverse on grounds other than sufficiency of the evidence, do we remand for a new trial? Yes. Okay. So, I mean, there will be a new trial. There's no double jeopardy? No, there's no double jeopardy in this case. If it's other than sufficiency? No. Okay. All right. Thank you, counsel. We'll hear from the government. Well, you're surviving. Fifty years, Your Honor. Fifty years. Wow. That's impressive. And unfortunately, Judge Ferguson and I go back those fifty years, and the more important thing is I'm surviving with Judge Reel, because I go back to 1969, as the court can see in these briefs. The very first criminal trial I ever had was in front of Judge Reel, which was the Hibbler case, which was cited in the brief. That was my very first case. You're a sparring partner. Unfortunately, yes. He said he'd just finished a trial in front of Dean, and it was a real pleasure. Who said that? Mr. Sherman. Well, may it please the Court for me about his business? I don't talk to him about his. All right. Thank you. Yes. May it please the Court, David Goodhand for the United States. I'll try and address the issues that were presented and the order they were presented. So I'll first start with the issue of bias, the claim that counsel for Mr. Ognibor has posed. One of the first things to remind the Court, of course, is that there were several curative instructions provided by the Court, and I apologize at the outset, because we omitted to mention one curative instruction, which I think is important to focus on. It was actually the last instruction given to the jury, and this is at page 27 of the April 24th transcript, and it was a very strong admonition. No question of mine, no admonition of mine to any counsel, no ruling that I have made on any evidence is to suggest in any way what verdict I think you should find. Your verdict and the verdict that you return is your exclusive responsibility. Let me ask a global question, and I'm probably the only person in the room who's not an L.A. insider here, so I don't have all the history that everybody at each of these tables have. You're from the Department of Justice? Yes. You're from D.C., right? You're from D.C. So you don't have the long list. Hey, I'm on board with you. There's two of us, so maybe we can work. Yes. Maybe you're colleagues? I don't know. Maybe we can work together, and it seems like really bad stuff. And your brief is quite candid, I think, in saying a lot of this stuff shouldn't have occurred, and we have a judge with whom it's occurred in the past, and the Court, for whatever reason, saw fit not to reverse convictions in that case. The appearance of justice issues here bother me, not so much the particular rulings. And does a curative instruction at the end of all that really solve the problem? In other words, if a judge behaves in a way that even the Department of Justice says he shouldn't have behaved over the course of a long trial, does the fact that he says to the jury, oh, never mind, really cure the problem? It's a part of the picture, I would suggest, Your Honor. I've been doing this a long time. I've read a lot of transcripts. I certainly don't stand here and disagree with the suggestion that there was tension in this courtroom, there were admonitions in this courtroom, there were statements in this courtroom. Probably it wasn't your usual case. Not my usual case, no, in reading the transcripts. I focus on curative instructions because this Court has focused on curative instructions, and in particular, I would cite to Morgan from this Court at 376 F. 3rd at 1008, and this is a quote from the Court, even in cases where a judge's participation is extreme, that participation generally does not warrant reversal of a later curative instruction as given. So that's one piece of the puzzle from my perspective. That's another fiction in the law, right? Your Honor, I'm certainly not going to agree with the suggestion it's a fiction. The Supreme Court has said juries must be assumed to follow their instructions. I can only cite to one instance, Bruton, for example, where the Court has said, we're going to put that aside. So they're given significant weight. Does it matter when they occur? I'm sorry? Does it matter when they occur? I mean, you and I have been in lots of trials, I suspect, and a lot of times a judge will have a sparring issue with a lawyer and then say to the jury, Mr. Hurwitz and I are just going over it at this point in the law, don't take anything out of this. But when the judge waits until the end and out of a long trial and says, this stuff has all been occurring, I assume you shouldn't pay any attention to it. Isn't that different? Well, to clarify the record, actually the judge gave several instructions. One at the end of the second day, at the end of a fairly heated back and forth between defense counsel and the Court, and then at the beginning of the third day, there was another instruction, and then a reminder at the end of the fourth day, and then the one I just read. Okay. So you think Huber will be there? I think that, again, that's a big piece of the puzzle, number one. And then I want to turn to the issue of this whole notion of burden shifting. There's a whole other constellation of instructions that I think help greatly on that. For example, defense counsel is focused on the opening statements and the Court's interruption of defense counsel. Well, following the opening statements, the Court gave an instruction, defendant has no burden, defendant doesn't have to put on any evidence. Right. So what bothers me about that is that defense counsel got up, and I did read all these transcripts, or at least the relevant parts of them. The defense counsel got up and said, well, the government said, and he was cut off. And he said, well, the government said, he was cut off. And then he was admonished, no, you have to say what your evidence will show. You have to say what your evidence, you can't talk about the government. Well, doesn't that give you the impression that there's an affirmative obligation on the defense to talk about the evidence that it's going to put on? I mean, and that's not the law in any way, yet the judge, I mean, we're all experienced in this regard. And normally, the opening statement is allowed to point at the holes in the government's evidence and talk about what the government said for opening. So that's just the beginning of this long series of improper expectation that you're creating on the part of the jury. Sure. And again, unfortunately, it seems like it was an unfortunate phrasing on the part of the trial judge. Because when you look at this court's sample instruction on what an opening statement is, it says, quote, it is simply an outline to help you understand what that party expects the evidence will show. Different. Right. So what he did versus what his written instructions were that he read are two different things. They're 180 degrees. Right. So what do you think impresses the, I mean, we can go with the jury's supposed to follow the law, but what do you think really impresses the jury more? What the judge is doing throughout the trial? Or what it reads to him at the end? I think, again, this court has to assume that juries listen to their instructions and follow them. Will a jury be influenced between the give and take? Yes. But if the last words ringing in their ears are this kind of strongly worded counsel that I just quoted, you know, nothing I've done here should be something that should influence your verdict. We have to assume that they abide by those. Well, I've been thinking about the Scott case too. And that was about five years ago. And there was a finding that most of the comments that were cut off were irrelevant or unimportant or repetitive. But here we not just, we not only just have that, but we have some fairly egregious substantive errors as well. And I think that's what takes us out of the Scott case. And also I think what they were trying, many of the questions and many of the things that the defense counsel was trying to do in any other courtroom would have been allowed to go forward. I'd be happy to talk about the substantive issues, but with one sort of caveat. What Litge teaches from the Supreme Court, granted a judge recusal case, but its language is quite informative for this analysis, is that if you have a true standalone substantive issue, as my opponents have proffered many of them to the court, then you bring it up and you ask for reversal. But I don't think the government, I can't stand here and defend every single ruling, every single objection that was overruled from the trial court. I'd be happy to talk about substantive issues, but I only understand they've teed up several, the Obudi phone call, the 404B cross, things like that. But Litge teaches us that unless the jury gets a sense from the judge's comments and or, for example, aggressive questioning of a witness, and I don't think we have that here, or general admonitions to counsel, unless the jury comes away with a clear sense of take care of any sort of heated back and forth, any sort of hostility. Does there have to be a substantive error for the, to deal with the judicial bias issue? I mean, let's assume that you got a case with 400 close calls and everyone goes against the defense and the judge makes the kinds of comments he was making here. Even if we don't find that any of those 400 rulings were themselves reversible error, isn't that some evidence of judicial bias? And 400 is a number I'm making up, as you know. I understand, but again, I think Litge counsels against that type of analysis. That is, Litge sort of gets at the core of it, which is, how is, a jury doesn't know about the propriety of a ruling when a ruling happens. And what I understand in this court's sort of analysis in the context of Pritchard and Hall and cases like that is whether or not the jury has communicated a sense of partiality such that they think the judge is in the government's camp, on the one hand, and or that the judge is against a particular defendant, on the other hand. And you know, look, I also want to make, before I sit down, I want to make sure I make... I mean, but look, if the judge is beating up on one of the lawyers, what do you think the jury is thinking? Well... And then he says, oh, disregard what I said. Is that going to erase it all? I think that's what this... Well, jurors, you know, their minds aren't, you know, like a clean slate until after, you know, at the time they start deliberating. You know, they make up their minds as evidence comes in, you know, and they think about it. And then they're also trying to figure out, well, are we deciding this case properly? You know, the judge should know, and we're concerned about doing the proper thing. And they get these signals that emanate from the judge. And right off the bat, you know, Mr. Sherman gets beaten up. You know, and I think, you know, I read that question. I thought it was a very compound question, and there was a... The government made a general objection, and the judge sustained it. And he wanted... Mr. Sherman wanted to know, well, what was wrong? Well, he got the answer that I'm not here to teach law school. If you don't know it, then don't blame me about it. You know... Harsh words. What that tells me is that the judge really didn't know what was wrong with that question and didn't want to give him another chance to ask it. Your Honor, I 100% agree. Listen, right from the start, the first day was... And I think this is the first time that Mr. Sherman has been in that arena. Right. So he's got a lot of calluses on his head. Right. I understand. If the suggestion is that jurors are humans, of course they are. Jurors come in, and they see something that the judge does, and they see the black robe on the judge, and they see the position of power that a judge occupies. You know, of course, conclusions will be drawn. But the government's point, and consistent with this Court's case law, is that... I agree with you. I'm not arguing that we have lots of cases that say that the judge gives these instructions, and that cures all the problems. Let me ask you another question. Yes. If we were to reverse this case on grounds of judicial bias or any other grounds not having to do with sufficiency, what's your position on remanding for a different district court judge to do the new trial? Your Honor, from the government's perspective, based on what we've argued in the brief, number one. And number two, I think I understand it's DOJ policy. We can't ask for a different judge. Okay. So I have to be agnostic. You can't take a position? No, without SG approval. Okay. So I'm not going to stand here and take a position on that. All right. I think I've taken a position in my brief with respect to how we... On that note, let's make sure we don't clump all of these defendants together. Okay, good. Let's talk about Morishita. Is there any record evidence other than the Sutton Declaration that ties her to the prescriptions from the list of doctors? I do not believe so. I believe that the Sutton Declaration comes from Victoria Onyebor, and Victoria Onyebor said the four doctors, Sun, Grimes, two others whose names escape me right now, and then two additional beneficiaries all were false prescriptions and that those all emanated from... Is there any corroboration to that? No, not that I know of, except for the pervasive Fendi fraud that, you know... Yeah, but we're dealing with a specific part of a sentence. Sure, but... You're already being sentenced for the fraud. Right, of course, but we're in a clearly erroneous standard of view, number one. Number two... Yeah, but haven't we said that hearsay should be corroborated before it's used to enhance a sentence? I don't. I may be wrong. I don't think that's if we're talking about reliable... Well, in calculating the amount of loss, you know, what we've got here is sort of a... The evidence is not in the record at trial. The judge is not dealing with that. He's dealing with somebody saying, oh, somebody told me that there was more loss, and I'm wondering whether that's sufficient. Somebody, a particularly unreliable person with every reason to be talking now, told me... Sure, and again... It doesn't go to the conviction. It goes to the sentence. And this is clearly erroneous. As I understand clearly erroneous, Anderson v. Bessemer City says if there are two different perspectives, then the perspective that prevailed is the one that must be affirmed. Can I just briefly go back? What I meant when I said let's not clump all the defendants together, I want to have just 30 seconds to try and articulate what I mean by that when we go back to the bias issue. Go ahead. Do it. Have it. I'm sorry? You have four minutes to do it. Four minutes. Okay. As I think even Defendant Anyabur has conceded in her reply brief, counsel, the invective, any admonitions, any hostility was overwhelmingly, if directed to anyone, directed to Defendant Dr. J, counsel. There was strong evidence, for example, Defendant Morishita, she confessed. Two agents walked into court and said she confessed to kickbacks. That was corroborated by 33 checks amounting to $47,000 coming from Fendi. The evidence with respect to Anyabur and Fendi was even more powerful. Three doctors walked into court, Dr. Grimes, Dr. Gohar, Dr. Sapuya, Dr. Gohar's daughter, that is. Each of them said, I've looked at every one of these prescriptions, 19 prescriptions, 14 prescriptions, 13 prescriptions, I believe. None of them were for patients I have seen. These are not my signatures. There was overwhelming evidence of fraud related to Fendi. Godwin Anyabur was tied to Fendi in several powerful ways. My point is this. We can't just say this court can do whatever it wants. I don't want to instruct this court what it can do. I would suggest to this court that if you are in the business of asking whether or not a jury was overcome with partiality emanating from a judge, you've got to slice and dice the three defendants here because that's what they've done in their reply brief and that's what the evidence did. Can you address the hearsay issue? Sure. Absolutely. As I understand Mr. Anyabur's point with respect to the 404B evidence, the phone call from Ove Budde, there were two things that I understand him to be complaining about. One, the transcript seemed to smuggle in translations from Ove Budde. First of all, I don't think the record supports that. If you look at the Q&A from Agent Watkins, you will see that he said, I came up with the transcript. It was confirmed by Ove Budde, number one. But number two, it's really who cares. The transcript wasn't admitted for the truth of the matter asserted. It was an aid for the jury. The court told the jury you can only rely on the phone call. The second piece of the puzzle, and I feel that Mr. Anyabur is more focusing on this, relates to Agent Watkins' testimony at the conclusion of the phone call. That is, Agent Watkins offers an opinion that when they say something, they're talking about a wheelchair. Yes, exactly. He's not qualified as an expert. I'm not sure it's a hearsay issue, but I'm troubled by it. He's not qualified as an expert. I'm sure he's not saying somebody else told me it was a wheelchair, because then it would be testimonial hearsay. So how does he get to say that? He gets to say that for this reason. First, let me direct the court to the transcript page 805-806. That's where the prosecutor asks this question. Tape played. Right. Based on everything you've heard. Yes. Based on everything you've heard, what is that? And it seems to me, how does he have any ñ in the absence of being qualified as an expert or channeling somebody else's testimony, how can he say that means wheelchair? He can say that for this reason. This court's decision in the United States v. Vera says that's perfectly permissible as a Federal Rule of Evidence 701 lay witness opinion. And if the court would indulge me, a law enforcement officer involved in the investigation may offer lay opinions about the meaning of intercepted phone calls, but these opinions are subject to the requirements of Federal Rule of Evidence 701. The requirements of 701 are twofold. Rationally based on the agent's perception, number one, and number two, helpful to determine a fact and issue. Agent Watkins' testimony satisfied both those. And again, beckoning to Vera, 770F3-1243, this court, he may interpret ambiguous conversations based on his knowledge of the investigation, including his direct perception of several hours of intercepted conversations and other facts he learned during the investigation. We don't have several hours of intercepted phone calls.  He said he listened to it a bunch of times. But he does testify at length about his participation in the investigation. Exactly. Didn't he testify that he told them what to seek? Yes. You want to ask questions about prescriptions, you want to ask questions that will describe the wheelchairs and all that. Yeah. So then what he's saying is that, well, I told them to make sure when this conversation was going to be ongoing to make sure that they touched on those, whatever it was, three areas. I think that's correct. And he assumed they did that. I think that's correct. In the examination of Agent Watkins, he explained how he got to the point of the phone call. And I think he said, you know, he talked to Obud, and he said, you know, I want you to do this. But that wasn't admitted for the truth of the matter asserted. What was admitted for the truth of the matter asserted was the lay opinion of Agent Watkins pursuant to federal evidence. So you agree this was a lay opinion? Yes, absolutely. I don't think there's any other way to justify this. It would have been problematic but for the fact that he said based on what you just heard and his investigation, but it wasn't problematic otherwise. I apologize. I see I've gone over my time. I'd be happy to answer any other questions. Anybody else have any other questions for the government? Well, if you have the court behaving abusively, couldn't we wonder whether some of that spilled over to the other defendants? Of course. But I would suggest given what the sort of catalog, the litany of things that have been proffered by the defendants, you can see they almost conceded in a reply brief. This was directed at one person, number one. Number two, if you disagree with my suggestion that the instructions otherwise helped deal with that one defendant, you certainly can't disagree, I would suggest, with the suggestion that the instructions otherwise dealt with the two defendants  Thank you, Your Honors. We would ask that you infirm the judgment and conviction. Thank you. Thank you, counsel. Any other questions? We should go ahead. Okay. All right. United States v. Anwar et al. will be submitted, and this session of the court is adjourned for today. Thank you very much, counsel.
judges: Pregerson, Wardlaw, Hurwitz